## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ARISTOTLE INTERNATIONAL, INC., | |
| *Plaintiff*, | |
| v. | No. 22-cv-741 (DLF) |
| ACUANT, INC. *et al.*, | |
| *Defendants.* | |

## <u>MEMORANDUM OPINION</u>

Aristotle International, Inc., brings this suit against Acuant, Inc., a company that contracted to resell Aristotle's identity verification service, and GB Group PLC, a competitor that acquired Acuant.  *See* Compl. ¶¶ 20, 30, Dkt. 3.  Aristotle alleges that the defendants misappropriated Aristotle's trade secrets in violation of the federal Defend Trade Secrets Act (DTSA) and D.C.'s Uniform Trade Secrets Act (DCUTSA).  *Id.* ¶¶ 53–59, 61–65.  It brings further claims against Acuant for breach of contract, *id.* ¶ 69–70, and against GB Group for interference with contractual relations, *id.* ¶ 77.  Before the Court is the defendants' motion to dismiss for lack of personal jurisdiction and failure to state a claim.  Dkts. 20, 27.  For the reasons that follow, the Court will grant in part and deny in part the defendants' motion.

## I.     BACKGROUND[1]

Aristotle provides consumer and voter data, data services, and analytics to customers including political organizations and businesses.  Compl. ¶ 3.  It also provides identity and age

---

[1] In a motion to dismiss, the Court accepts the facts alleged in the complaint "as true and draw[s] all reasonable inferences from those allegations" in Aristotle's favor.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

verification services through its Integrity division.  *Id.* ¶ 9.  Through that division, Aristotle has developed verification methodologies and compiled data spanning over a hundred countries, which it stores in its databases and uses to "provide clients with the most up-to-date data, best practices, and data quality."  *Id.* ¶¶ 10–12.  Aristotle has implemented various procedures to protect the confidentiality of this information, including detailed employee policies, confidentiality agreements, physical protections at offices, technological protections, and contractual protections with customers and third-party partners.  *Id.* ¶¶ 13–19.

In 2015, Aristotle entered into a contract with Acuant, a corporation providing identity verification, document authentication, and fraud prevention technology.  *Id.* ¶¶ 4, 20.  The contract allowed Acuant to resell ███████████████████████████████████████ ██████████████████ (paragraph 1).  *Id.* ¶ 20.  It laid out terms for such resale, including that Acuant must ████████████████████████████████ (paragraph 2) and notify Aristotle of ██████████████████████████████ (paragraph 3).  *Id.* ¶¶ 21–22. Furthermore, ██████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ *Id.* ¶ 23. The contract gave Aristotle 48 hours to decline approval (paragraph 4).  *Id.*  The contract also laid out the pricing structure that Aristotle used to provide services to Acuant.  *Id.* ¶ 27.

In addition, the contract gave Acuant access to much of Aristotle's confidential information and required Acuant to hold that information "in strict confidence[,] take all reasonable precautions to protect" it, not divulge it to third parties, and not use it except as authorized.  *Id.* ¶ 24.  It further required Acuant to provide written notice to Aristotle if the confidential information was breached, *id.* ¶ 26, and, upon the contract's termination, to "[i]mmediately" "return[] or destroy[]" the

confidential information and provide written notice that it had done so, *id.* ¶ 25.  Under these conditions, Aristotle shared confidential information with Acuant related to its Integrity services. *Id.* ¶ 28.  On August 11, 2021, for example, Acuant requested certain sensitive information about Aristotle's data coverage by country, which Aristotle provided.  *Id.* ¶ 29.

On November 18, 2021, GB Group, a United Kingdom-based company that provides identity verification, document authentication, and fraud prevention technology services, announced that it would acquire Acuant for $736 million.  *Id.* ¶¶ 5, 30.  Before then, GB Group and Acuant engaged in discussions to facilitate GB Group's decision whether to acquire Acuant. *Id.* ¶ 30.  GB Group ultimately decided to acquire Acuant to help "accelerate[] the rollout of GBG's identity and fraud solutions globally" and in North America in particular.  *Id.* ¶ 31.

A few days after this announcement, Aristotle asked Acuant to certify that it had destroyed or returned Aristotle's confidential information and had not shared its confidential information with GB Group.  *Id.* ¶ 32.  Acuant did not do so.  *Id.*  On December 1, 2021, Aristotle again raised its confidentiality concerns with Acuant, reminded Acuant of its contractual confidentiality obligations, and asked Acuant to affirm that it had not shared Aristotle's confidential information with GB Group.  *Id.* ¶ 33.  Between December 1 and December 13, Aristotle, Acuant, and GB Group engaged in a series of phone and written conversations in which Aristotle repeatedly requested assurance that its information had remained confidential, but the conversations were not fruitful.  *Id.* ¶¶ 34–40.  During one such conversation, GB Group "nearly quoted from certain portions" of the Aristotle-Acuant reseller agreement.  *Id.* ¶ 36.

On December 17, 2021, Aristotle sent a letter to Acuant terminating the contract and, per the termination provision, requesting that Acuant return or destroy Aristotle's confidential information and provide written confirmation.  *Id.* ¶ 40.  Acuant responded on December 21, 2021,

requesting further discussions.  *Id.* ¶ 41.  Acuant continued to refuse to provide the requested written confirmations.  *Id.* ¶¶ 42, 45–46.

On January 19, 2022, Acuant sent Aristotle ███████████ for the first time.  *Id.* ¶ 43.  The ████████████████████████ to which Acuant ████████ ████ but it did not include all of the information required under paragraph 4 of the contract, ████████████████████████  *Id.*  After receiving the ████ Aristotle asked Acuant when it began ████████████████████████, but Acuant did not provide further information.  *Id.*  Aristotle concluded that Acuant had ████████ ████████████████████████ as required by paragraphs 2 and 4 of the contract.  *Id.*  Two days later, Aristotle informed Acuant that it ████████ ████████████████████████ *Id.* ¶ 44.  ████████████████████ ████████  *Id.*

On March 17, 2022, Aristotle brought this suit for misappropriation of trade secrets against Acuant and GB Group, breach of contract against Acuant, and interference with contractual relations against GB Group.  *Id.* ¶¶ 53, 61, 69, 77.  The defendants moved to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction and under Rule 12(b)(6) for failure to state a claim.  Defs.' Mem. in Supp. of Mot. to Dismiss, Dkts. 20 (redacted version), 27 (sealed version).

## II.   LEGAL STANDARD

### A.  Rule 12(b)(2)

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a party may move to dismiss an action when the court lacks personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  "On such a motion, the plaintiff bears the burden of 'establishing a factual basis for the exercise of personal

jurisdiction' over each defendant." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 20 (D.D.C. 2017) (quoting *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)). To meet this burden, a plaintiff cannot rely on conclusory allegations, *id.*, but rather must allege specific facts connecting the defendant with the forum, *see Shibeshi v. United States*, 932 F. Supp. 2d 1, 2–3 (D.D.C. 2013) (citing *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)). When ruling on a 12(b)(2) motion, the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Triple Up Ltd.*, 235 F. Supp. 3d at 20 (quotation marks omitted). "Ultimately, the Court must satisfy itself that it has jurisdiction to hear the suit." *Id.* at 20–21 (quotation marks omitted).

### B. Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and

the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quotation marks omitted). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.    ANALYSIS

### A.    Personal Jurisdiction

The Court "may exercise one of two types of personal jurisdiction: (1) 'general or all-purpose jurisdiction' or (2) 'specific or case-linked jurisdiction.'" *Lewis v. Full Sail, LLC*, 266 F. Supp. 3d 320, 323 (D.D.C. 2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). General jurisdiction does not apply here because neither Acuant nor GB Group are organized or maintain a principal place of business in D.C. *See* Compl. ¶¶ 4–5; *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (explaining that these are the "paradigm bases for general jurisdiction" (quotation marks and alterations omitted)); D.C. Code § 13–422 (providing general jurisdiction over a company "organized under the laws of, or maintaining . . . its principal place of business in" D.C.). Even so, the Court may exercise specific jurisdiction over both Acuant and GB Group.

#### i.    *Personal jurisdiction over Acuant*

"[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected

with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires*, 564 U.S. at 919 (quotation marks omitted). "To establish [specific] personal jurisdiction, [a] plaintiff[] must (1) plead facts sufficient to show that jurisdiction is appropriate under the District of Columbia's long-arm statute and (2) satisfy the 'minimum contacts' demands of constitutional due process." *Fuentes–Fernandez & Co. v. Caballero & Castellanos, PL*, 770 F. Supp. 2d 277, 281 (D.D.C. 2011) (quoting *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)). Because the D.C. long-arm statute's provision of jurisdiction over any entity that "transact[s] any business in the District of Columbia," D.C. Code § 13-423(a)(1), extends as far as the Due Process Clause allows, the "statutory and constitutional jurisdictional questions . . . merge into a single inquiry: would exercising personal jurisdiction accord with the demands of due process?" *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (quotation marks omitted). "[A] court's exercise of personal jurisdiction over a defendant satisfies due process if there are 'minimum contacts' between the defendant and the forum such that the defendant 'should reasonably anticipate being haled into court there.'" *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020) (quoting *Thompson Hine*, 734 F.3d at 1189). "That is, there must exist 'a relationship among the defendant, the forum, and the litigation' such that 'the defendant's suit-related conduct creates a substantial connection with the forum.'" *Id.* (quoting *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1036 (D.C. Cir. 2020) (alterations omitted)).

In general, "a forum legitimately may exercise personal jurisdiction over a nonresident who purposefully directs his activities toward forum residents. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (quotation marks omitted). For contract-related cases like this one, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of

their activities." *Id.* (quoting *Travelers Health Ass'n v. Com. of Va. ex rel. State Corp. Comm'n*, 339 U.S. 643, 647 (1950)).  While an individual's contract with a forum resident "*alone* [cannot] automatically establish sufficient minimum contacts" with that forum, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," may boost the contacts past the constitutional minimum.  *Burger King*, 471 U.S. at 478–79.  The Supreme Court has thus held, for instance, that a defendant—despite lacking "physical ties" to Florida—was subject to suit there because he "deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise," thereby "enter[ing] into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts" with the plaintiff in Florida.  *Id.* at 479–80 (quotation marks and alterations omitted).

Likewise, Acuant's contacts with the District of Columbia are sufficient to confer jurisdiction in this Court.  Acuant "reached out beyond" its home state and "negotiated with a [D.C.] corporation," *id.*, Aristotle, to enter into an agreement to resell Aristotle's verification services.  Compl. ¶ 20.  This agreement included a structured, ongoing relationship between the two companies which necessarily required Acuant to maintain consistent contacts with Aristotle, a D.C.-based corporation.  For instance, under the contract, Acuant had access to Aristotle's product and confidential information, and in return Acuant had to keep the information confidential, use it only as permitted by the agreement, and notify Aristotle of any breach.  *Id.* ¶¶ 24, 28–29.  In addition, Acuant had access to Aristotle's software services, which it resold to third parties under certain conditions prescribed by the agreement, including a requirement to █████████████████████████████████.  *Id.* ¶¶ 20–23.  Given Acuant's "voluntary acceptance of [this] long-term" and structured relationship with Aristotle in D.C., "the quality and

nature of [its] relationship to the company in [D.C.] can in no sense be viewed as random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 480 (quotation marks omitted); *see also Helmer v. Doletskaya*, 393 F.3d 201, 206 (D.C. Cir. 2004) (concluding that contract in which "the parties contemplated future repeated contacts with the District of Columbia as a condition of performance," among other things, created "a substantial connection with the District of Columbia" permitting suit).

This conclusion is bolstered by the provision in the contract stating, "This Agreement shall be performed entirely within . . . the District of Columbia." Integrity Services Reseller Agreement ¶ 12(i), Defs.' Mem. Ex. 1, Dkt. 27-1. A contractual provision that "the contract is to be performed, in whole or in part, in D.C." is usually sufficient to create "a substantial connection between the contract and the forum." *Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 7 (D.D.C. 2009) (quotation marks omitted); *see also id.* at 7 n.4 (collecting cases). Even if Aristotle has not specifically alleged that the contract was "physically performed" in D.C., Defs.' Reply at 7–8, Dkt. 32-2, that the contract provides for performance in D.C. nonetheless evidences that Acuant deliberately reached into D.C. for the purposes of this contract and should have reasonably foreseen being "called to account" here for any breach. *Burger King*, 471 U.S. at 480; *see also Md. Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 91 (D.D.C. 2019) ("When parties negotiate a contract where performance is to occur in a particular forum, they harbor [the] expectation" that they "might be sued [there].").

Moreover, the contract's choice-of-law provision, though not dispositive on its own, further shows that Acuant "purposefully invoked the benefits and protections of [D.C.'s] laws for jurisdictional purposes." *Burger King*, 471 U.S. at 481–82; *see* Integrity Services Reseller Agreement ¶ 12(i) ("This Agreement shall . . . be constructed under[] the laws of the District of

Columbia.").   When combined with the ongoing contractual relationship Acuant forged with Aristotle, this provision "reinforce[s] [Acuant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation [here]."  *Burger King*, 471 U.S. at 482.

Finally, this "litigation results from alleged injuries that 'arise out of or relate to'" Acuant's contacts with D.C., *id.* at 472–73 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)), because it was this contract that Acuant allegedly breached.  *See* Compl. ¶¶ 67–70.  The two other claims against Acuant for misappropriation of trade secrets, *see id.* ¶¶ 48–56, 61, likewise arise out of Acuant's contacts with D.C.  Aristotle maintained its confidential trade secrets within the District, *see, e.g.*, *id.* ¶ 16 (describing "physical protections" at Aristotle's D.C. headquarters "to ensure the secrecy of its confidential information"), and Acuant only had access to those trade secrets pursuant to its contract with Aristotle, *see id.* ¶ 28.  Because this litigation is related to Acuant's D.C. contacts, asserting specific jurisdiction over Acuant in this case comports with the Due Process Clause.  *Burger King*, 471 U.S. at 472–73.

## ii.   *Personal jurisdiction over GB Group*

The above analysis does not apply to GB Group because it was not a party to the contract between Acuant and Aristotle.  *See, e.g.*, *Intera Corp. v. Henderson*, 428 F.3d 605, 619 (6th Cir. 2005) (explaining that where defendants "were not parties" to contract containing Tennessee choice-of-law provision, they "could [not] have reasonably expected to be haled into a Tennessee court").  Nevertheless, this Court may assert personal jurisdiction over GB Group under the long-arm provision contained in Rule 4(k)(2) of the Federal Rules of Civil Procedure.

Rule 4(k)(2) "permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal

jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). The Rule was created to "correct[] a gap in the enforcement of federal law" when a foreign defendant has had "contacts with the United States sufficient to justify the application of United States law, but [has] ha[d] insufficient contact with any single state to support jurisdiction." *Id.* at 10 n.9 (quoting Fed. R. Civ. P. 4(k) advisory committee's notes to 1993 amendments (alteration omitted)). Here, each of the requirements for invoking Rule 4(k)(2) are met.

First, one of Aristotle's claims against GB Group arises under federal law: the DTSA, 18 U.S.C. § 1836. *See* Compl. ¶ 47–59. That the two other claims against GB Group are based in local law—the DCUTSA, D.C. Code § 36-401, and D.C. tort law, *see* Compl. ¶¶ 60–65, 74–79— "is not fatal" to those claims. *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90 (D.D.C. 2006). "That is because the D.C. Circuit has adopted the doctrine of pendent personal jurisdiction, whereby a court may assert personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id.* (quotation marks omitted) (citing *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 5 (D.C. Cir. 1977)). Thus, Aristotle may "obtain personal jurisdiction over the defendant with respect to any of [its] claims that arose out of the same core of operative fact as those claims which clearly fell within the scope of" Rule 4(k)(2). *Oetiker*, 556 F.2d at 4. The local law claims against GB Group are based on the same facts as the federal claim—namely, GB Group's collaboration with Acuant to obtain Aristotle's trade secrets, *see* Compl. ¶¶ 61, 77—so this Court may exercise personal jurisdiction over the local law claims, too.

Second, the requirement that Aristotle "serv[e] a summons or fil[e] a waiver of service,"

Fed. R. Civ. P. 4(k)(2), is also met.  The parties' representation that "GB Group PLC agreed to waive service under Fed. R. Civ. P. 4(d)" suffices to satisfy this requirement.  Joint Mot. for Extension of Time to Answer ¶ 1, Dkt. 10.

As to the third requirement, the D.C. Circuit "has adopted the following burden-shifting framework: 'A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. . . .  If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).'"  *Mwani*, 417 F.3d at 11 (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).  GB Group contends that it cannot be sued in D.C.  *See* Defs.' Mem. at 9–12.  And in response to Aristotle's explicit invocation of Rule 4(k)(2) and this Court's order directing GB Group to identify any state where suit would be possible, GB Group refused to name a state.  GB Group PLC's Resp. to Minute Order at 1, Dkt. 36 ("This case fails to present a situation in which any federal court may exercise its judicial power over GBG.").  Where, as here, the "defendant does not concede to jurisdiction in another state, [the] court may use 4(k)(2) to confer jurisdiction."  *Mwani*, 417 F.3d at 11 (quotation marks omitted).

Fourth and finally, exercising jurisdiction is consistent with the Constitution.  "[F]or the purposes of Rule 4(k)(2)," this question "depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment."  *Id.*  As explained above, this "requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities."  *Id.* at 11–12 (quotation marks and citations omitted).  This analysis focuses not on the defendant's "contacts with the

District of Columbia," but "with the nation as a whole." *Id.* at 12.  In this case, there is no doubt that GB Group had sufficient purposeful contacts with the United States as a whole "such that [it] should reasonably anticipate being haled into court [here]." *Id.* (quoting *Burger King*, 471 U.S. at 747).  Although GB Group is organized in the United Kingdom, at the time of the complaint it had at least three United States offices (in California, Georgia, and New York).  Compl. ¶ 5.  Further, it reached out to the United States to acquire a company incorporated in Delaware with a principal place of business in California, stating that the acquisition was a "natural complement to GBG's existing US-based services." *Id.* ¶¶ 4, 30, 31.  These contacts with the United States are far more than the minimum required to give GB Group "fair warning that [its] activities would subject [it] to the jurisdiction of the United States." *Mwani*, 417 F.3d at 13 (quotation marks omitted).  Thus, the Court has personal jurisdiction over GB Group under Rule 4(k)(2).

### B.      Failure to state a claim

Acuant and GB Group alternatively moves to dismiss the complaint for failure to state a claim under Rule 12(b)(6), asserting that Aristotle failed to plausibly plead a claim of trade secret misappropriation against either defendant, a breach of contract claim against Acuant, or an intentional interference with contractual relations claim against GB Group.  The Court will deny the motion as to the first two types of claims and grant it as to the third.

#### i.      *Trade secret misappropriation claims against both defendants*

Both federal and D.C. law grant a private cause of action to a plaintiff who "own[s] a trade secret that is misappropriated."  18 U.S.C. § 1836(b)(1) (DTSA); *see also* D.C. Code §§ 36-402, 403 (DCUTSA).  To state a plausible claim, the owner must show both that a trade secret existed and that it was misappropriated.  *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007).

1. Trade secret

"The threshold inquiry in every trade secret case is whether or not there is a trade secret to be misappropriated." *Id.* (quotation marks and alteration omitted). A "trade secret" includes (A) "all forms and types of financial, business, . . . [or] economic . . . information" that (B) the owner "has taken reasonable measures to keep . . . secret" and (C) "derives independent economic value . . . from not being generally known." 18 U.S.C. § 1839(3); *see also* D.C. Code § 36-401(4). Aristotle's allegations are sufficient to satisfy these requirements, at least at the motion to dismiss phase.

First, numerous "federal courts have held that customer lists, pricing information, sales and marketing strategies, and other business information can constitute 'trade secrets' under the DTSA provided the other requirements of that statute are met." *More than Gourmet, Inc. v. Finnegan*, No. 5:18-cv-2509, 2019 WL 13199822, at *6 (N.D. Ohio Sept. 10, 2019) (collecting cases); *see, e.g.*, *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1260 (3d Cir. 1985) ("'[C]osting' and 'pricing' information . . . [not] readily obtainable . . . qualifies for trade secret protection."); *AlterG, Inc. v. Boost Treadmills LLC*, No. 18-cv-07568, 2019 WL 4221599, at *6 (N.D. Cal. Sept. 5, 2019) ("Pricing and marketing strategies tied to specific products are typical trade secrets."); *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009) ("Customer pricing lists, cost information, confidential customer lists, and pricing and bidding formulas may constitute trade secrets.").[2]   Aristotle alleges that the defendants misappropriated not just the contract between Aristotle and Acuant, as the defendants' contend, *see* Defs.' Mem. at 16, but also business

---

[2] Cases dealing with other states' trade secret statutes are "appropriate to consider" here because "the D.C. statute was intended 'to make uniform the law with respect to trade secrets among the District of Columbia and those states enacting [the Trade Secrets Act].'" *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 7 n.3 (D.D.C. 2004), *aff'd*, 173 F. App'x 825 (Fed. Cir. 2006) (quoting D.C. Code § 36–408).

information such as "pricing structure and strategies" that was in the contract, *see* Compl. ¶¶ 27–
28.  Aristotle further alleges that the defendants misappropriated business information obtained
pursuant to the contract, such as Aristotle's "data coverage by country," "Integrity's matching
methodologies for verification," and other processes, methodologies, and data.[3]  *Id.* ¶¶ 28–29; *see
also id.* ¶¶ 20–23.  This, too, is the type of information that can be considered a trade secret as
defined by the statute.  *See* 18 U.S.C. § 1839 ("trade secret[s]" may "includ[e] patterns, plans,
compilations, . . . methods, techniques, processes, procedures, programs, or codes").

Second, the complaint lists the "multi-layered" efforts Aristotle took to keep this
information secret, including its "formal policies and procedures to ensure that its employees
maintain the secrecy of its confidential information"; "physical protections at its offices" and at its
servers; "technological protections" such as "software security providers" and "encryption . . . [of]
data"; and "contractual protections" such as non-disclosure agreements.  *Id.* ¶¶ 13–19.  Indeed,
Aristotle gave Acuant access to its information only pursuant to the parties' confidentiality
agreement.  *Id.* ¶ 19, *see also id.* ¶¶ 28–29.  Furthermore, Aristotle took efforts to maintain the
confidentiality of its contract with Acuant and the pricing and other strategies contained therein.
*See id.* ¶ 24 (explaining that the contract had a provision that the agreement itself was confidential).

Third, Aristotle's complaint alleges that "[t]his information is valuable and proprietary to
Aristotle and, if such information were shared in the market generally, or to any competitor" such
as GB Group, "it could cause significant irreparable harm to Aristotle."  *Id.* ¶ 12.  Aristotle could
plausibly derive value from the secrecy of pricing strategies, for example, as revealing it—

---

[3] The defendants unfairly fault Aristotle both for "providing formulaic recitations" of the elements
*and* for "not includ[ing] the phrase 'trade secret'" in various paragraphs of the complaint.  *See*
Defs.' Reply at 10–11.  As to both criticisms, it is not "labels" that matter, but whether the facts
alleged in the complaint plausibly amount to a violation of the statute.  *Twombly*, 550 U.S. at 555.
As explained, they do.

especially to competitors—could "damage [its] competitive position." *SMS Data Prod. Grp., Inc. v. Dep't of Air Force*, No. 88-cv-0481, 1989 WL 201031, at *4 (D.D.C. Mar. 31, 1989). Further, Aristotle "invested significant time and resources developing its databases of identity data" that it provides to customers and "the methodologies underlying the identify verification services it offers" through Integrity. Compl. ¶¶ 3, 10–11.

Finally, Aristotle has identified its alleged trade secrets with sufficient particularity to avoid dismissal under Rule 12(b)(6). *Cf.* Defs.' Mem. at 15–16; Defs.' Reply at 10–11. "Construing the DTSA, district courts have found that plaintiffs are not required to identify trade secret information in detail in order to avoid dismissal at the 12(b)(6) stage." *More than Gourmet, Inc.*, 2019 WL 13199822, at *6 (collecting cases). Rather, the information need be identified only "with enough specificity to place a defendant on notice of the bases for the claim being made against it." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021). Aristotle has provided sufficient detail to put the defendants on notice what kind of information is at stake here. *See, e.g.*, Compl. ¶ 29 (describing "highly sensitive confidential information about Aristotle's data coverage by country" sent to Acuant on August 11, 2021). The defendants' "demand for further precision in the pleading is thus misplaced," as it "ignores the challenges a trade secret plaintiff commonly faces when only discovery will reveal exactly what the defendants are up to." *Oakwood Lab'ys*, 999 F.3d at 907. "The question of whether [this] information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side." *DSMC*, 479 F. Supp. 2d at 79 (quotation marks omitted).

### 2.  Misappropriation

The term "misappropriation" includes the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"

as well as "disclosure or use of a trade secret of another without express or implied consent" by one who "knew or had reason to know" that the trade secret was "derived from or through a person who owed a duty to the [plaintiff] to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5); *see also* D.C. Code § 36-401(2). "[T]he DTSA thus authorizes suits alleging three theories of trade secret misappropriation: (1) acquisition, (2) disclosure, and (3) use." *Zaccari v. Apprio, Inc.*, 390 F. Supp. 3d 103, 113 (D.D.C. 2019); *see also DSMC*, 479 F. Supp. 2d at 79 (DCUTSA standard). Both statutes further define "improper means" to "include[] . . . breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A); *see also* D.C. Code § 36-401(1).

At this stage in the proceedings, Aristotle has sufficiently pled that Acuant disclosed and GB Group acquired its trade secrets. The complaint alleges that Acuant had access to Aristotle's trade secrets pursuant to the parties' agreement. Compl. ¶ 28. It further alleges that Acuant specifically requested Aristotle's "highly sensitive confidential information about [its] data coverage by country" on August 11, 2021, without divulging that at that time it was "in talks, or had agreed, to be acquired by" GB Group. *Id.* ¶ 29–30. Concerned that Acuant had shared confidential information with GB Group during the acquisition due diligence process, Aristotle then repeatedly "requested that Acuant certify that it destroyed or returned Aristotle's confidential information"—but Acuant refused to do so. *Id.* ¶ 32; *see also id.* ¶¶ 33–39, 41–42, 45, 54. Later, GB Group officers "nearly quoted from certain portions of" the Aristotle-Acuant contract, *id.* ¶ 36, suggesting that GB Group had reviewed the contract contained information alleged to be trade secrets (such as Aristotle's resale and pricing strategies), *see, e.g.*, *id.* ¶¶ 20–23, 27–28. In addition, Aristotle alleges that GB Group did so with knowledge that Acuant was breaching its contractual duty to maintain secrecy, as the contract stated it was confidential. *See id.* ¶ 24. Relying on these

facts and its "information and belief," Aristotle alleges that "Acuant improperly divulged Aristotle's trade secrets to GBG during due diligence for GBG's acquisition of Acuant and continues to improperly share Aristotle's trade secrets in its possession with GBG, with full knowledge of, and in breach of, the confidentiality restrictions in the Agreement," and that GB Group "receiv[ed] Aristotle's trade secrets from Acuant in violation of Acuant's obligations to Aristotle under the Agreement and encouraged Acuant to provide such trade secrets during acquisition diligence and thereafter." *Id.* ¶ 53. Crediting these facts as true and construing all reasonable inferences in Aristotle's favor, as the Court must, the allegations suffice to show misappropriation, at least at this stage.

The defendants criticize Aristotle's allegations as "mere speculation" or a "hunch" based on "a common logical fallacy known as *post hoc ergo propter hoc* (after the fact, therefore because of the fact)." Defs.' Mem. at 16 (quoting *Young v. Burton*, 567 F. Supp. 2d 121, 140 (D.D.C. 2008)); Defs.' Reply at 12. This criticism is misplaced. For one, *Young* dealt with the standard for allowing expert witnesses to testify at trial, *see* 567 F. Supp. at 140–41, and is not applicable to a motion to dismiss. Further, at this stage, the plaintiff must simply state a "plausible"—*not* a "probab[le]"—claim for relief; creating a "reasonable inference that the defendant is liable for the misconduct alleged" is sufficient. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556, 570). In trade secret cases in particular, "misappropriation and misuse can rarely be proved by convincing direct evidence," so plaintiffs often rely on "circumstantial evidence" that creates an inference of misappropriation. *Oakwood Lab'ys*, 999 F.3d at 910, 913 (quotation marks and citation omitted). Aristotle has done just that: its inference of misappropriation is based, in part, on the circumstantial evidence that GB Group announced its decision to acquire Acuant "just three months after Acuant requested and received highly sensitive and confidential information from

Aristotle," Compl. ¶ 30, and GB Group's apparent ability to quote portions of a confidential agreement between Acuant and Aristotle thereafter, *id.* ¶ 36.  These allegations surpass "naked assertions" or "[t]hreadbare recitals of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678. Thus, the Court declines to require "direct proof of misappropriation, without permitting the discovery essential to uncovering the evidence for proper consideration of the merits."  *Oakwood Lab'ys*, 999 F.3d at 913.[4]

Because Aristotle has plausibly alleged both the existence of a trade secret and improper acquisition or disclosure of that trade secret, the Court will deny the defendants' motion to dismiss the DTSA and DCUTSA claims.

ii.     *Breach of contract claim against Acuant*

To prevail on a breach of contract claim in the District of Columbia, a plaintiff must establish four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach."  *Bonfire, LLC v. Zacharia*, 251 F. Supp. 3d 47, 51 (D.D.C. 2017) (quoting *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1023 (D.C. 2013)).

Aristotle alleges two categories of breach of contract.  The first set of allegations concerns violations of the contract's provisions dealing with confidential information and is based on the same underlying facts as the trade secret misappropriation claims.  *See* Compl. ¶ 69.  Acuant's motion to dismiss addresses only this category of claims, and its arguments fail for the same

---

[4] The defendants' rebuttal, that "[g]overning law" requires Aristotle to do more to allege misappropriation, is not persuasive.  *See* Defs.' Reply at 12 (citing *Econ. Rsch. Servs., Inc. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219 (D.D.C. 2016)).  Even setting aside the fact that another district court case is no more binding on this Court than the Third Circuit case *Oakwood Laboratories*, *see City Stores Co. v. Lerner Shops of D.C., Inc.*, 410 F.2d 1010, 1014 (D.C. Cir. 1969) (explaining that both are nonbinding persuasive authority), the district court case cited did not address the misappropriation element at all and is thus not on point here.  *See* 208 F. Supp. 3d at 232–33 (addressing only whether the information at issue was a trade secret).

reasons as explained above.  *See* Defs.' Mem. at 17–18 (making the same arguments to dismiss breach of contract claim as trade secret claim).  Furthermore, Aristotle's statement that it has suffered damages related to its "reputation and . . . loss of its competitive edge in the industry," Compl. ¶ 72, suffices to satisfy the fourth element, as D.C. law does "not require[]" a plaintiff to specifically "allege the damages caused by a breach of contract to survive a Rule 12(b)(6) motion to dismiss." *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 207 (D.D.C. 2016) (citing *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015)); *cf.* Defs.' Mem. at 17.

Acuant's motion to dismiss wholly fails to address Aristotle's second category of breach of contract claims, which are unrelated to the disclosure of confidential information.  *See* Defs.' Mem. at 17–18 (addressing only confidentiality claims).  This claim alleges that Acuant violated contractual provisions related to the terms and processes for reselling Aristotle's Integrity identification services.  Compl. ¶ 70.  Aristotle's complaint describes the existence of a binding contractual duty for Acuant to resell Integrity only under certain terms, *see id.* ¶¶ 20–23, and details Acuant's alleged breach of that duty by, for instance, not ████████████████████████████ ████████████████████████, *id.* ¶¶ 43–44.  Because Acuant's motion to dismiss does not challenge the sufficiency of these claims, the Court will not address it.  *See Rollins Env't Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 653 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief.").  Accordingly, Aristotle's breach of contract claims may proceed.

       *iii.*    *Intentional interference with contractual relations claim against GB Group*

To state a claim for intentional interference with contractual relations under D.C. law, a plaintiff must allege four elements: "(1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach." *Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 22 (D.D.C. 2002) (quoting *Sorrells v.*

*Garfinckel's*, 565 A.2d 285, 289 (D.C.1989)).  Aristotle alleges that, despite knowing of Aristotle and Acuant's confidentiality agreement, GB Group "requir[ed] Acuant to provide Aristotle's confidential information during due diligence for its acquisition of Acuant" in violation of that agreement.  Compl. ¶ 77.  This "[t]hreadbare" and "conclusory statement[] do[es] not suffice" to plausibly allege the third element.  *Iqbal*, 556 U.S. at 678.

The complaint provides no factual basis to support the allegation that GB Group intentionally procured the breach of Aristotle's contract with Acuant by "requiring" Acuant to turn over Aristotle's confidential information.  *See* Compl. ¶ 77.  At most, the complaint alleges that GB Group "saw the confidential Agreement [between Acuant and Aristotle] without permission." Pl.'s Mem. in Opp'n at 13, Dkt. 24.  But even accepting that fact as true, it is equally plausible that Acuant voluntarily disclosed the confidential information to GB Group as it is that GB Group required Acuant to do so.  And "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability," the complaint has not reached the plausibility threshold required to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  The rest of Aristotle's arguments, including that GB Group "surely" asked Acuant for confidential information and "likely" was particularly interested in a competitor's information, Pl.'s Opp'n at 13, provide no "more than a sheer possibility that [GB Group] has acted unlawfully." *Iqbal*, 556 U.S. at 678.  Accordingly, Aristotle's interference with contractual relations claim against GB Group will be dismissed.

## CONCLUSION

For the foregoing reasons, the Court denies the defendants' motion to dismiss as to the DTSA, DCUTSA, and breach of contract claims.  The Court grants the motion to dismiss as to the intentional interference with contractual relations claim under Rule 12(b)(6).  A separate order consistent with this decision accompanies this memorandum opinion.

_Dabney L. Friedrich_
DABNEY L. FRIEDRICH
United States District Judge

January 4, 2023